UNITED STATES DISTRICT COURT
WESTERN DISTRICT OF KENTUCKY
OWENSBORO DIVISION

No. 4:18-cv-168

| | |
|---|---|
| **JACK PAPINEAU and HOLLY PAPINEAU** | **PLAINTIFFS** |
| v. | |
| **BRAKE SUPPLY COMPANY, INC., et al.** | **DEFENDANTS** |
| and | |
| **BRAKE SUPPLY COMPANY, INC.** | **THIRD-PARTY PLAINTIFF** |
| v. | |
| **FRAS-LE S.A., FRAS-LE NORTH AMERICA, et al.** | **THIRD-PARTY DEFENDANTS** |

## MEMORANDUM OPINION AND ORDER

After doctors diagnosed Jack Papineau with mesothelioma, he and his wife sued Brake Supply and several manufacturers of products that allegedly contained asbestos. The parties have engaged in vigorous motion practice and discovery, resulting in the dismissal of some parties and the addition of others. Now Brake Supply seeks summary judgment against the Papineaus on all of their claims on the ground that the Papineaus lack evidence that Mr. Papineau encountered asbestos from Brake Supply's products, or that any alleged encounters were a substantial factor in causing his illness. Brake Supply also contends that the Kentucky Middleman Statute, KRS 411.340, exempts it from liability as a distributer, and that the Plaintiffs cannot demonstrate that Brake Supply was grossly negligent—essential for their punitive-damages claim.

Inextricably related to the summary judgment question are several other motions from both sides asking the Court to exclude or limit the testimony of various experts. Resolving these motions will define the contours of the evidence bearing on summary judgment.

The rules of evidence and tort liability dictate that the testimony of some experts should be limited. But the law provides no basis to exclude the entirety of any witness's proposed expert testimony. Given the substantial and conflicting testimony that each side marshals, the Court agrees with the Papineaus that genuine issues of material fact remain for resolution by a jury—particularly regarding causation and liability under the Middleman Statute, if not gross negligence under Kentucky law. The Court therefore denies in part and grants in part Brake Supply's motion for summary judgment (DN 337), denies in part the motion to exclude the expert testimony of Steven Paskal (DN 346), and—based in large part on the parties' concessions during argument—denies the remaining motions in limine (DNs 341, 342, 343, 344, 345, 347, 348, 353), albeit without prejudice to revisiting these objections at trial.

## RECORD EVIDENCE

Apparently undisputed evidence makes several aspects of this controversy clear at this stage of the litigation. Jack Papineau worked for Smith Coal as a Class C oiler mechanic for approximately nine years (1984–93) at three different surface mine sites in Western Kentucky. Complaint (DN 1) ¶ 12; Papineau Dep. (DN 337-2) at 29:15–23, 32:11–33:24. His responsibilities included servicing mining equipment and assisting mechanics performing more complex work—including brake jobs—on mining equipment. Papineau Dep. at 33:1–19, 44:7–10. Regarding his brake work specifically, Mr. Papineau serviced many types of large trucks and equipment—Terex scrapers, Mack service trucks, and Euclid, LeTourneau, and Caterpillar haul trucks. *Id.* at 40:21–51:14.

Evidence shows that Mr. Papineau performed more than 200 brake jobs during his tenure with Smith Coal. *Id.* at 59:3–10, 75:11–17, 84:10–85:1. After removing the equipment's wheel, Mr. Papineau would remove the brake drum, clean it with compressed air and an electric grinder, and then remove the brake shoe using a hammer or hydraulics. *Id.* at 58:3–15, 61:3–16, 64:7–65:17. The brake shoes are huge, curved pieces lined with friction pads measuring about 8x24". *Id.* at 67:11–22. Next he would attach a new shoe and reinstall the whole brake on the equipment. *Id.* at 66:19–22. Each step of this process, Plaintiffs insist and Brake Supply appears to concede, disturbed brake dust that Mr. Papineau breathed and touched. *Id.* at 60:2–7, 61:8–20, 62:12–25, 65:1–25.

How much dust? The parties dispute this, along with most other factual issues. Each side offers its own industrial hygienist to testify about whether Mr. Papineau's occupational exposure fell within an acceptable range.

Another important question is whether these friction products contained asbestos, and whether Smith Coal obtained them from Brake Supply or only from other manufacturers or distributors during Mr. Papineau's tenure. Brake Supply is known as a "rebuilder" of used brake shoes. Berkley Dep. (DN 337-5) at 118:1–6. Brake Supply would strip off brake linings from used brake shoes, refurbish the shoes, and install new brake linings before selling these products to companies like Smith Coal for installation on their trucks. *Id*. at 118:1–21. Brake Supply acquired these materials from other manufacturers, which may or may not have used asbestos in their products. The industry moved away from asbestos-containing friction products at some point during Mr. Papineau's employment, but the parties appear to disagree about when that change happened or how it would have affected Mr. Papineau's asbestos exposure. *See* Ferguson Dep. (DN 337-8) at 64:8–23.

Even assuming Brake Supply distributed some asbestos-containing friction products during Mr. Papineau's tenure, this would not settle the question whether Mr. Papineau worked with asbestos-containing products supplied by Brake Supply. Mr. Papineau could not recall using brakes supplied by any company other than Brake Supply. Papineau Dep. 2 (DN 337-3) at 36:13–20. But business records and testimony from others—warehouse employees, salesmen, and supervisors—provide some evidence he did and some evidence he didn't work with asbestos-containing products from Brake Supply. *See* Motion for Summary Judgment ("MSJ") (337-1)_at

6–12 (describing evidence); Summary Judgment Response (DN 355) at 4–7 (same); Titus Dep. (DN 337-9) at 25:1–12 (Smith Coal primarily ordered hydraulics from Brake Supply); Rice Dep. (DN 355-6) at 50:13–18 (Brake Supply refurbished most of Smith Coal's brakes of the type Mr. Papineau used); Snow Dep. (DN 355-7) at 78:24–79:22 (most of the company's brake products came from Brake Supply); Vandiver Dep. (DN 355-9) at 55:10–56:25, 116:14–23 (supervisor's testimony that he and Mr. Papineau used Brake Supply brakes for many of their jobs).

Still another question is whether Mr. Papineau's exposures to asbestos-containing friction products (assuming they came from Brake Supply) were a substantial factor contributing to his illness. Each side presents a slate of experts—toxicologists, hygienists, and medical doctors—in support of its views on the source, type, and cause of Mr. Papineau's mesothelioma. And each side objects to the testimony the other side's experts propose to offer.

## MOTIONS TO EXCLUDE EXPERT TESTIMONY

Whether these experts' testimony is admissible determines the scope of the record before the Court at the summary-judgment stage. Federal Rule of Evidence 702 allows opinion testimony by "[a] witness who is qualified as an expert by knowledge, skill, experience, training, or education" if the testimony satisfies four conditions connecting the expertise and the litigation:

(a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
(b) the testimony is based on sufficient facts or data;
(c) the testimony is the product of reliable principles and methods; and
(d) the expert has reliably applied the principles and methods to the facts of the case.

The Supreme Court has interpreted this rule to assign trial judges a "gatekeeper" function in determining whether proposed expert testimony is sufficiently reliable and relevant for the jury to consider. *Kumho Tire Co. v. Carmichael*, 526 U.S. 137, 147 (1999). The Sixth Circuit, "[p]arsing the language of the Rule," has recognized "that a proposed expert's opinion is admissible, at the discretion of the trial court, if the opinion satisfies three requirements"—qualification, relevance, and reliability. *In re Scrap Metal Antitrust Litig.*, 527 F.3d 517, 528–29 (6th Cir. 2008).

An expert is *qualified* by "knowledge, skill, experience, training, or education." Fed. R. Evid. 702. The expert's testimony is *relevant* when it will assist the trier of fact in understanding the evidence or determining a material fact in question. *See Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579, 591–92 (1993). And proposed testimony is *reliable* when it is grounded in valid methods and procedures that support its trustworthiness, *id.* at 590 n.9, leaving trial courts "considerable leeway in deciding … how to go about determining whether particular expert testimony is reliable," *Kumho Tire,* 526 U.S. at 152.

The trial court's gatekeeping role "is not designed to have the district judge take the place of the jury to decide ultimate issues of credibility and accuracy." *Lapsley v. Xtek, Inc.*, 689 F.3d 802, 805 (7th Cir. 2012). Alleged flaws in the accuracy of scientific results, when produced by generally reliable scientific methods, is the proper subject of cross-examination, not exclusion. *In*

3

*re Scrap Metal*, 527 F.3d at 530 (citing *Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1345 (11th Cir. 2003)). Nor can "a district court [] exclude an expert because it believes the expert lacks personal credibility:" questions about "an expert's believability or persuasiveness" are "reserved for the trier of fact." *Rink v. Cheminova, Inc.*, 400 F.3d 1286, 1293 n.7 (11th Cir. 2005). As long as the *Daubert* analysis is met, the Court should not exclude expert opinions that have "a reasonable factual basis." *United States v. L.E. Cooke Co.*, 991 F.2d 336, 342 (6th Cir. 1993). "Rather, it is up to opposing counsel to inquire into the expert's factual basis." *Id*.

## I. Medical-Causation Experts

### 1. Dr. Arthur L. Frank

Dr. Frank is a medical doctor and professor who specializes in occupational exposure to asbestos. The Papineaus offer Dr. Frank to testify that Mr. Papineau's exposure to asbestos from Brake Supply's products was the specific cause of his mesothelioma.

To recover on their claims, the Papineaus must prove both general causation (that specific quantities of asbestos exposure can cause mesothelioma), and specific causation (that exposure to asbestos-containing friction products were a substantial factor in causing Mr. Papineau's illness). *See Pluck v. BP Oil Pipeline Co.*, 640 F.3d 671, 676–77 (6th Cir. 2011); *Deutsch v. Schein*, 597 S.W.2d 141, 143–44 (Ky. 1980), *abrogated on other grounds by Osborne v. Keeney*, 399 S.W.3d 1 (Ky. 2012). To be a substantial factor, a defendant's products must be a *probable* cause of the alleged injuries, not merely a *possible* cause. *Briner v. General Motors Corp.*, 461 S.W.2d 99, 101 (Ky. 1970).

The Sixth Circuit has interpreted Kentucky's substantial-factor test to disallow the "each and every exposure" theory of causation. This theory, according to physician testimony reviewed by the Sixth Circuit, posits that "there is no safe level of asbestos exposure, and that every exposure to asbestos, however slight, [is] a substantial factor in causing [mesothelioma]." *Lindstrom v. A-C Prod. Liab. Tr.*, 424 F.3d 488, 493 (6th Cir. 2005), *abrogated on other grounds by Air & Liquid Sys. Corp. v. DeVries*, 139 S. Ct. 986 (2019). The Court of Appeals rejected that theory because, "as a matter of law," it "does not provide a basis for a causation finding." *Id.* ("A holding to the contrary would permit imposition of liability on the manufacturer of any product with which a worker had the briefest of encounters on a single occasion."). Subsequent decisions have upheld this limitation, explaining that the connection between a single asbestos exposure and mesothelioma is too tenuous to amount to a "substantial cause" under Kentucky law. *Martin v. Cincinnati Gas & Elec. Co.,* 561 F.3d 439, 443 (6th Cir. 2009).

Dr. Frank, in particular, has previously adopted this theory as the basis for his expert testimony. And the Sixth Circuit has twice concluded that his opinion did not rest on evidence that satisfied Kentucky's substantial-factor test. *Stallings v. Georgia-Pac. Corp.*, 675 F. App'x 548, 551 (6th Cir. 2017); *Moeller v. Garlock Sealing Techs., LLC*, 660 F.3d 950, 954 (6th Cir. 2011). In both cases, the Court of Appeals took care to explain that Dr. Frank's testimony had failed to show that the defendant's product at issue was, in and of itself, a substantial factor in causing the plaintiffs' injuries. As a matter of medicine, it may well be true that no level of asbestos exposure is "safe." As a matter of law, however, the each-and-every theory "would 'make every

incidental exposure to asbestos a substantial factor,' rendering that standard, and its substantiality requirement, all but 'meaningless.'" *Stallings*, 675 F. App'x at 551 (*citing Martin*, 561 F.3d at 443).

Dr. Frank's testimony in this case differs from previous iterations of the each-and-every theory, though it retains a strong family resemblance. Plaintiffs' counsel explained that Dr. Frank would be presenting a "cumulative dose" theory of causation: "lots of [asbestos] exposures contribute to the cumulative dose, but not all exposures are significant contributions to the cumulative dose." Oral Arg. Tr. at 18:17–19. During his deposition, presumably mindful of the risks posed by the Sixth Circuit decisions mentioned above, Dr. Frank specifically disclaimed the notion "that one fiber can cause or does cause mesothelioma." Frank Dep. (DN 345-2) at 40:10–13. Dr. Frank sought to clarify that he didn't believe any history of asbestos exposure sufficed to cause mesothelioma:

> Q. As I understand your testimony, it is sufficient, in your view, if there is a history of asbestos exposure, to offer the opinion that someone's mesothelioma is caused by that asbestos exposure, correct?
>
> A. No, it's not correct. I have to have a history of exposure above background. I have to have a latency of 10 years and a proper diagnosis of an asbestos-related disease, such as mesothelioma, and then I can make the diagnosis.

Frank Dep. at 88:12–24. And his affidavit explained the significance of determining the relative contributions of various sources of asbestos exposure.

> In determining the relative contribution of any exposures to asbestos above background levels, it is important to consider a number of factors, including: the nature of exposure, the level of exposure and the duration of exposure, whether a product gives off respirable asbestos fibers, the level of exposure, whether a person was close to or far from the source of fiber release, how frequently the exposure took place and how long the exposure lasted, whether engineering or other methods of dust control were in place, and whether respiratory protection was used.

Frank Aff. (DN 345-7) at 214, ¶ 415; *id.* at 211–12 ¶ 407 ("I am not offering *legal* opinions about whether an exposure is 'significant' or 'substantial' within the meaning of the law.").

Dr. Frank's testimony in this case, as described by the plaintiffs, differs in two important respects from that rejected by the Sixth Circuit.

*First*, he purports to have ruled out exposures other than brake work. Mr. Papineau's only significant source of asbestos exposure above ambient levels, in Dr. Frank's view, came from his work with brakes at Smith Coal and on his own cars and projects at home. For this reason, Dr. Frank will testify that he can causally tie Mr. Papineau's mesothelioma to identifiable sources of exposure. Dr. Frank Response at 14. This avoids problems of competing sources of asbestos exposure that Dr. Frank's causation analysis did not or could not account for in cases where Dr. Frank's opinions were rejected. Oral Arg. Tr. at 19:2–7. For example, the plaintiff in *Stallings*

5

was exposed to asbestos both from his employer as well as his service in the Navy. 675 F. App'x at 551.

What distinguishes Dr. Frank's conclusions here is his effort to link his causation assessment to Brake Supply products specifically, rather than lumping them in with every other sources of exposure on an "every little bit counts" theory. *See Lindstrom*, 424 F.3d at 493 (expert testimony attempting to "base causation on any hypothetical exposure, however slight" is insufficient to avoid summary judgment). Of course, this doesn't resolve whether Brake Supply's products were a substantial source of exposure to Mr. Papineau; that is a factual question for the jury to determine with the aid of other evidence and testimony.

*Second*, counsel proposes to offer this cumulative-dose theory in conjunction with the medical testimony of Dr. Staggs regarding which exposures are and aren't substantial. Dr. Frank and Dr. Staggs will also rely on the testimony of other witnesses and the industrial hygienist to support their opinions that Mr. Papineau's exposure to brakes supplied by Brake Supply is a significant cause of Mr. Papineau's own mesothelioma. Once again, this tips the scales against excluding Dr. Frank.

This is, nevertheless, a close question. Brake Supply points to testimony from Dr. Frank that seemingly adopts the each-and-every theory:

> Q. Mr. Papineau's exposures to asbestos from any product substantially contributed to his mesothelioma, however slight the exposure; correct?
>
> A. True.

Frank Dep. at 112:12–16. Dr. Frank is of course free (and obliged) to truthfully answer opposing counsel's questions, such as the one above, even if the questions stray into a legally impermissible theory of causation. His affirmative testimony, however, poses a greater risk: Dr. Frank's affidavit states he "believe[s] that every occupational, para-occupational, environmental or domestic exposure contributes to the risk of developing mesothelioma." Frank Aff. at 211 ¶ 407. And in his report, Dr. Frank said:

> The cumulative exposures that [Mr. Papineau] had to asbestos, *from any and all products, containing any and all fiber types, would have contributed to the development of [his disease]*. This would have included his work with friction products at Smith Coal as well as his personal use of brakes when repairing his own vehicles and his wife's vehicles. All of these exposures would have been at levels above background, would have been medically significant, and, therefore, medically causative of his mesothelioma.

Frank Report at 2 (emphasis added). Based on quite similar statements in *Stallings*, the district court concluded that Dr. Frank's opinions improperly embraced the each-and-every theory—and the Sixth Circuit affirmed. *Stallings*, 675 F. App'x at 551 n.1. This Court would exclude this testimony if Dr. Frank, on direct examination, offered testimony indistinguishable from that which the Sixth Circuit has already rejected.

But Dr. Frank's cumulative-dose theory, as confined during oral argument in this case, would not appear to transgress the legal limits highlighted by Brake Supply. And as long as Dr. Frank does not advance the each-and-every theory, the Court will not exclude his testimony. If Dr. Frank is unable to avoid this theory, Brake Supply is free to renew its motion to exclude.

### 2. Dr. Brent Staggs

The Papineaus offer Dr. Staggs to opine about the likely cause and location of Mr. Papineau's mesothelioma. As with Dr. Frank, Brake Supply objects that Dr. Staggs's testimony uses the each-and-every theory. Motion to Exclude Dr. Staggs (DN 347-1) at 3. Dr. Staggs concludes that Brake Supply products were a substantial contributing factor to Mr. Papineau's illness. Dr. Staggs, like Dr. Frank, appears to distance himself from reliance on the each-and-every theory: "When I review an individual's exposure to asbestos and evaluate the causation of disease, as I have done in this case, I do not state that any contributor to the cumulative dose, no matter how small, is a significant factor to the development of mesothelioma." Staggs Report (DN 347-2) at 6. This testimony appears to avoid the limits set forth under the law of Kentucky and the Sixth Circuit. The Court therefore repeats its admonition regarding Dr. Frank, but declines to exclude Dr. Staggs's testimony on this basis (DN 347).

Brake Supply also objects that Dr. Staggs' testimony could include industrial-hygiene opinions or opinions based on unreliable and insufficient evidence. Motion to Exclude Staggs at 4–8. The Papineaus concede that Dr. Staggs is not an industrial hygienist and "will not offer industrial hygiene opinions but will offer medical opinions." Response to Motion to Exclude Staggs (DN 361-1) at 2. Dr. Staggs formed his medical opinions "that brakes caused [Mr. Papineau's] disease," they say, from "various assumptions … based upon evidence" of Papineau's work history and the Helsinki Criteria, a diagnostic criteria used in assessing asbestos-related disorders. Oral Arg. Tr. at 13:16–18; *see also* Response to Motion to Exclude Staggs at 2. The underlying evidence includes Papineau's medical records, Papineau's two depositions, the parties' discovery responses, and co-worker affidavits. Letter to Staggs (347-4). If Brake Supply believes this evidence is insufficient to support Dr. Staggs' medical opinion, Brake Supply may advance that line of attack on cross-examination. But his causation testimony does not appear so lacking in support to warrant its total exclusion. This is far more than a "lone sentence" about occupational asbestos exposure that lacks "a sufficient amount of information for [a causation] opinion to be reliable." *Schindler v. Dravo Basic Materials Company, Inc.*, 2019 WL 446567, at *5 (E.D. La. Feb. 5, 2019).

Last, Brake Supply objects to Dr. Staggs' opinion that Papineau has primary pleural mesothelioma. Brake Supply says Dr. Staggs used unreliable methodology because he "has not cited any scientific basis to support the opinion that relative tumor size and clinical presentation alone are sufficient for a differential diagnosis of tumor origin." Reply to Motion to Exclude Staggs at 8. Brake Supply points to its own expert's competing opinion and methodology to support this assertion. *Id*. at 5–6. The Court will not weigh the parties' competing expert testimony to pass judgment on the superior differential diagnosis, and will not exclude Dr. Staggs on this basis, either.

### 3. Dr. Victor Roggli

Brake Supply offers Dr. Roggli to testify that Brake Supply's friction products were likely not the cause of Mr. Papineau's diagnosis. The Plaintiffs do not question the credentials of Dr. Roggli's, a pathologist in the field of asbestos medicine and forensic attribution of mesothelioma to asbestos exposure. Dr. Roggli is qualified to testify based on his education, training, experience, and publications that address issues relevant to this case. Roggli C.V. (DN 366-1).

The motion to exclude reveals a critique of Dr. Roggli's persuasiveness, not his admissibility. The Papineaus' criticisms of Dr. Roggli's conclusions, their own experts' differing perspectives, and Brake Supply's rejoinders go to the weight, not the admissibility, of expert testimony. And the Papineaus do not point to any case in which a court excluded Dr. Roggli's opinions. Response to Motion to Exclude Dr. Roggli (DN 366) at 15. None of this triggers the Court's duty to exclude inappropriate opinion testimony, and the parties conceded as much during oral argument. Oral Arg. Tr. at 70:12–24.

The Papineaus also objected to Dr. Roggli's potential testimony about "fiber burden analysis." They are concerned that Dr. Roggli will rely on past analyses, unavailable to the Plaintiffs and unspecific to Mr. Papineau's disease, that no brake mechanic could *ever* develop mesothelioma as a result of workplace exposure to asbestos-containing friction products. *Id.* at 71:19–72:23.

But Brake Supply acknowledges the difference between full epidemiological studies and the case studies and published papers Dr. Roggli relies on, conceding that the former are less authoritative. *Id.* at 73:6–9. Brake Supply agreed that Dr. Roggli would not base his conclusion solely on the fiber-burden analyses. *Id.* at 73:15–18. Given this caveat—which appears to satisfy the Plaintiffs' concerns, *see id.* at 72:20–21—the Court denies the motion to exclude (DN 343).

## II. Motion to Exclude Dr. Amy Madl

Dr. Madl, a toxicologist, would opine that a mechanic repairing brakes would not have been exposed to asbestos beyond accepted "occupational exposure limits," and that this exposure "would not have increased his risk of developing any asbestos-related disease, including mesothelioma." Madl Expert Report (DN 362-3) at 24. Exposure limits, as noted above, are relevant in toxic-tort cases in showing both general and specific causation. *See Pluck*, 640 F.3d at 676–77; *Tompkin v. Philip Morris USA*, 362 F.3d 882, 895–96 (6th Cir. 2004). Dr. Madl has studied, among other things, "historical exposures to airborne asbestos during gasket, packing, and brake repair activities" to examine the effects of asbestos exposure on vehicle mechanics. Madl C.V. (DN 362-1) at 1. According to Brake Supply, she would opine "that vehicle mechanics are at no increased risk of developing mesothelioma than the general population." Response to Motion to Exclude Dr. Madl (DN 362) at 4. Dr. Madl's report explains her primary conclusions and provides a foundation and peer-reviewed support. Madl Expert Report at 24–46. And the testimony is clearly relevant for a trier of fact to answer the question of general causation.

The Papineaus' motion in limine expresses concern that Dr. Madl will stray beyond her realm of expertise in general causation and attempt to offer an opinion on specific causation.

Motion to Exclude Dr. Madl (DN 341) at 3–4. During her deposition, however, Dr. Madl stated that "I'm not offering medical causation opinions," and declined to opine whether Mr. Papineau's disease was spontaneous. Madl Dep. (DN 362-2) at 102:23–24, 103:8–17. Brake Supply agreed that Dr. Madl would only offer general-causation opinions: "she is not expressing medical opinion as to the specific cause of Mr. Papineau's disease. Rather, she is expressing opinions as to general causation and increased risk of development of disease." Response to Motion to Exclude Dr. Madl at 6. And at oral argument, the Plaintiffs' counsel conceded that Dr. Madl could offer general-causation testimony, even about the possibility of spontaneous mesothelioma in brake mechanics, so long as she didn't stray into specific, diagnostic testimony regarding Mr. Papineau's illness. Oral Arg. Tr. (at 68:20–69:16). Dr. Madl may not opine about the specific causes of Mr. Papineau's mesothelioma, and the briefs and argument indicate she will not testify that the disease is in fact idiopathic. The Court therefore denies the Plaintiffs' motion to exclude her testimony.

### III. Motions to Exclude the Industrial Hygienists

Both parties expect to offer testimony from industrial hygienists regarding Mr. Papineau's level of occupational exposure at Smith Coal. The Papineaus' expert, Steven Paskal, determined that Mr. Papineau's asbestos exposure exceeded acceptable background levels. Brake Supply's expert, Don Marano, concluded that Mr. Papineau's exposure fell within permissible background ranges.

Both experts are well-qualified, offer opinions that will assist the trier of fact, and employed reliable methods when reaching their conclusions. Although the parties offer minor quibbles about these points in their briefing, at oral argument they essentially conceded that both experts were qualified to discuss industry-accepted background levels of asbestos exposure and Mr. Papineau's likely level of exposure. Oral Arg. Tr. at 53:10–22, 54:5–8. As Brake Supply's counsel explained: "the function of an industrial hygienist is to analyze the exposure scenarios, have an understanding of the work practices, [and discuss] the ability of certain products to result in a release of respirable asbestos fibers." *Id.* at 53:17–22.

Three issues remain, leading the Court to deny in full the Papineaus' motion to exclude Marano (DN 342) and grant only in part Brake Supply's motion to exclude Paskal (DN 346).

**1. Asbestos phaseout.** Marano intends to discuss the automotive industry's transition to non-asbestos-containing brakes in the mid to late 1980s, and how that phaseout likely affected Mr. Papineau's asbestos exposure. He appears to rely on several scientific studies demonstrating that asbestos exposure levels declined sharply beginning in the mid-1980s. Response to Motion to Exclude Marano (DN 363) at 9–10. The Papineaus criticize Marano's method because none of the studies he relied on addresses brakes for coal mining equipment in western Kentucky. Motion to Exclude Marano (DN 342) at 8. The plaintiff-side hygienist discusses a different report that concluded asbestos-free brakes did not exist for large mining equipment in the mid-1980s, and would not appear for some time thereafter. *Id.* The Papineaus' arguments represent a basis to criticize, but not to exclude, Marano's testimony about the phaseout. To be sure, Marano appears to lack knowledge of when Brake Supply in particular (as opposed to the industry generally) phased out its asbestos-containing brakes. Nor did he measure or otherwise assess Mr. Papineau's

personal exposure at Smith Coal. These limitations are the proper subject of cross-examination, not exclusion. *In re Scrap Metal*, 527 F.3d at 530.

**2. Medical causation.** Paskal proposes to testify that asbestos exposure exceeding permissible background levels increases an individual's risk of contracting mesothelioma. Paskal Report (DN 365-7) at 5. Brake Supply says his opinion relies on a theory of causation the Sixth Circuit has rejected: that each and every asbestos exposure, however slight, is a substantial contributing factor to the development of mesothelioma. *See* Motion to Exclude Paskal (DN 346-1) at 8; *Martin*, 561 F.3d at 443 (concluding this theory is inconsistent with Kentucky's substantial-factor standard of causation).

Paskal, the Papineaus say, will not opine on the specific cause of Mr. Papineau's actual illness, Paskal Response at 7–8, but will testify only that exposures above accepted background levels increases *anyone's risk* of developing mesothelioma, Paskal Report at 5. The Sixth Circuit has affirmed the admissibility of testimony regarding this distinction between unsafe background exposure levels in general, on the one hand, and medical causations opinions regarding a person's specific exposures and mesothelioma development, on the other. *See Bartel v. John Crane, Inc.*, 316 F. Supp. 2d 603, 607, 611 (N.D. Ohio 2004) (coupling "hard evidence" that exposure levels were below background with expert consensus "that exposure to asbestos at or below background levels does not cause disease"), aff'd sub nom. *Lindstrom*, 424 F.3d at 493 (expert testimony that "every exposure to asbestos, however slight" could cause mesothelioma could not satisfy the substantial factor test as a matter of law). In light of the Papineaus' representations that Paskal will offer only the former, the Court denies the motion to exclude. If Paskal's testimony at trial crosses the line into specific causation opinions, Brake Supply may renew its motion.

**3. Warnings.** Paskal also disclosed his opinion that Brake Supply should have provided clear warnings with its brake shoes stating the risk of cancer and the need for protective measures. Paskal Report at 5. Brake Supply has moved to exclude this testimony on the ground that Paskal is unqualified to opine on warning labels. Motion to Exclude Paskal at 12–14. In response to questions at oral argument about Paskal's relevant training and experience, plaintiff's counsel pointed, vaguely, to his training in industrial hygiene and his work on OSHA compliance in the U.S. Department of Labor. Oral Arg. Tr. at 59:15–60:4. The Papineaus' response brief contains similar allusions to "training," "hazard communication," and "widely accepted consensus standards." Paskal Response at 10–11. But neither the Papineaus nor Paskal explain what these standards are or how he applied them in this case, which leaves the Court with only the expert's "*ipse dixit*" that the defendant should've used labels. *See Gen. Elec. Co. v. Joiner*, 522 U.S. 136, 146 (1997) (district courts need not accept expert opinion on the mere say-so of the expert).

At argument plaintiff's counsel pointed to *Robertson v. Norton Co.*, 148 F.3d 905 (8th Cir. 1998), in support of the admissibility of Paskal's testimony about warnings. Oral Arg. Tr. at 60:13. But that out-of-circuit decision doesn't appear to help their cause. The court concluded the expert's expertise in manufacturing defects did *not* qualify him to opine on "questions of display, syntax, and emphasis." *Robertson*, 148 F.3d at 907. Nor was the opinion based on the kind of scientific knowledge or experience that would permit the court to assess whether its underlying method was valid. *Id.* Other courts have excluded experts for similar reasons. In *Patterson v. Century Mills, Inc.*, for example, the Sixth Circuit affirmed a district court's decision to prevent an expert from

testifying about warnings because the expert "had never written flammability warnings for clothing, had no specific education on warnings, had no specific training with respect to warnings on clothing, and had never had an article regarding clothing subjected to peer review." 64 F. App'x 457, 462 (6th Cir. 2003). Many of the same flaws appear here. Lacking any other details about Paskal's alleged expertise that could show its applicability to this case, the Court must exclude his testimony about warnings.

## IV. Berman and Crump Method

Several of Brake Supply's experts rely on asbestos-fiber potency ratios and coefficients from a study by Berman and Crump for their opinions. The Papineaus ask the Court to exclude this study and the expert opinions that rely on it. Motion to Exclude Berman and Crump Method (DN 344). At oral argument, counsel identified two primary objections: that the Defendant would improperly bolster the study's weight by referring to it as a "government study," Oral Arg. Tr. at 73:19–74:4, and that the study's specific potency ratio was based on deeply flawed data and methods, *Id.* at 74:19–25.

Neither objection persuades the Court to exclude all references to this study. The EPA has neither rejected nor endorsed the study, as both sides acknowledge, meaning that neither may characterize or imply otherwise. Oral Arg. Tr. at 73:20–74:4. And the Papineaus' methodological critiques go to weight, not admissibility. As another district court described causation reports using the Berman and Crump Method,

> they used valid scientific methodology, citing to peer-reviewed scientific studies, in reaching their conclusions regarding the varying potency of different asbestos fiber types, the lack of a causal link between chrysotile and peritoneal mesothelioma, and the concept of a threshold level of asbestos exposure. The fact that Plaintiffs can cite other studies which challenge the studies relied upon by Defendants' causation experts does not render their opinions unreliable.

*In re Asbestos Prod. Liab. Litig. (No. VI)*, 714 F. Supp. 2d 535, 546 (E.D. Pa. 2010). To the extent that the Plaintiffs are concerned about the introduction of specific potency ratios, the Defendant stated that it was unlikely to bring that information in, and the Court will address specific concerns about that data should they arise. Oral Arg. Tr. at 75:1–7. The Court denies this motion to exclude.

## V. Motion to Exclude Life Care Planner

The Papineaus offer Laura Lampton, a registered nurse employed as a life care planner, to testify about Mr. Papineau's expected future medical expenses. Lampton's estimates are based on a life care plan she created that outlines his projected future costs according to the American Association of Nurse Life Care Planners' methodology. Lampton Response (DN 359) at 2. Based on her assumption that he would live another 25 years (which appears to contradict counsel's

representations regarding the urgent need for a trial based on medical prognostication), Lampton conservatively estimated his life care costs at nearly $21 million. *Id.* at 2–3.[1]

Brake Supply objects to her testimony on three bases.

*First*, the total-cost and lifespan estimation is speculative. But Plaintiffs conceded during oral argument that Lampton's testimony should be limited to giving an annual cost of care estimate. Oral Arg. Tr. at 61:8–20. She will not speculate about how long Mr. Papineau may live or give a potentially out-of-context lump-sum projection of financial need.

*Second*, only a physician would be qualified to order care and estimate their likely expenses. Without specialized training, a life-care planner is generally not qualified to opine about "whether a plaintiff will need certain medical treatments and/or services in the future." *Walker v. Target Corp.*, 2017 U.S. Dist. Lexis 105038, at *7 (S.D. Miss. July 7, 2017). "Accordingly, the inclusion of future medical treatments and/or services in a life care plan must be supported by the opinion of a qualified medical expert." *Id.* In this case, however, Ms. Lampton estimated Mr. Papineau's future medical expenses based on the care he currently receives, Lampton Report (DN 359-2) at 1, and on "pertinent information" supplied by Mr. Papineau's doctors, *id.* Given this foundation, testimony regarding projected annual costs would find non-speculative support and remains admissible.

*Third*, the Ms. Lampton's estimates rely on projected future retail rates, not discounted or negotiated rates through insurance or Medicare. Motion to Exclude Lampton (DN 348-1) at 10–13.

This collateral-source issue differs from most precedent, which deals with a plaintiff's right to recovery of damages, not estimation of future loss. Collateral-sources rules typically prevent consideration of discounts or other sources of funding that could reduce otherwise recoverable healthcare expenses. S*ee Dossett v. Wal-Mart Stores East*, 2016 WL 183923, *1 (W.D. Ky. 2016).

At least one decision within this District has held that a plaintiff could recover for the unreduced price of future medical costs, but have allowed the parties to introduce evidence of the availability of future benefits. While a defendant "may establish that these benefits would continue to be available," a "plaintiff may, in turn, establish unavailability, inadequacy, or disinclination to utilize the facilities and benefits available for future care" in connection with "an award of future damages." *Harvey v. United States*, No. 3:09-cv-122, 2013 WL 2898785, at *3 (W.D. Ky. June 13, 2013).

Similar considerations apply here. Although Lampton may testify about the unreduced costs that comprise her life-care estimate, Brake Supply may cross-examine her and introduce any appropriate rebuttal evidence. In light of these limitations, the Court denies Brake Supply's motion to exclude Ms. Lampton's testimony.

---

[1] Lampton has been admitted to provide expert testimony on estimated future medical expenses by at least two prior courts. *Roach v. Hughes*, No. 4:13-cv-00136, 2015 WL 3970739, at *2–4 (W.D. Ky. June 30, 2015); *Oaks v. Wiley Sanders Truck Lines, Inc.*, No. 07-45-KSF, 2008 WL 4180267, at *4 (E.D. Ky. Sept. 8, 2008).

## VI. Loss of Work Expectancy

The Papineaus also offer Sara Ford, a vocational economic analyst, as an expert to testify about Mr. Papineau's projected lost earnings. Courts within this District have previously scrutinized and accepted Ford's qualifications and methods. *See Southard v. Belanger*, 966 F. Supp. 2d 727, 734–37 (W.D. Ky. 2013). The decision in *Southard* meticulously reviewed Ford's factual basis, methodology, and qualifications. The court explained why Ford satisfied the *Daubert* standards for admissibility and that remaining objections bore on "weight, as opposed to … admissibility," which objections the defendants were free to raise on cross-examination. *Id*.

Brake Supply attempts to distinguish this case in its reply, arguing that in *Southard*, Ford explained the plaintiff's medical disability, work limitations, and the economic loss. Ford Reply (DN 377) at 4–5. But Brake Supply does not explain what sort of evidence Ford relied on in *Southard* that she failed to account for in this case. Most of Brake Supply's objections pertain to the factual basis for Ford's opinions. Motion to Exclude Ford (DN 353) at 4–7, 10–14. These objections, however, attack the weight the jury should ascribe to Ford's opinions, not their admissibility, and do not provide the Court with a reason to exclude Ford. Brake Supply's remaining objection is that the Gamboa-Gibson disability work-life tables, which Ford allegedly relies on, are too generic and unreliable to provide a valid basis for her expert testimony. The tables' reliability and the extent of Ford's reliance remain disputed, *see* Response to Motion to Exclude (DN 360) at 8–9, and are best addressed by the parties at trial rather than by the Court through a motion to exclude.

## MOTION FOR SUMMARY JUDGMENT

Rule 56(a) of the Federal Rules of Civil Procedure directs courts to grant summary judgment "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a). The party seeking summary judgment bears the initial burden of "identifying those portions of the pleadings, depositions, answers to interrogatories, and admissions on file, together with the affidavits, if any, which it believes demonstrate the absence of a genuine issue of material fact." *Celotex Corp. v. Catrett*, 477 U.S. 317, 323 (1986) (internal quotation marks omitted). The non-moving party must then point to portions of the record supporting its position and demonstrating that a genuine dispute exists. *Id*. at 324.

Brake Supply seeks summary judgment on four grounds: the Papineaus 1) failed to identify evidence showing that Mr. Papineau was exposed to asbestos from products sold by Brake Supply to Smith Coal; 2) failed to identify evidence that exposure to Brake Supply products was a "substantial factor in causing" Mr. Papineau's illness; 3) cannot overcome the protective shield that the Middleman Statute (KRS 411.340) provides for mere resellers of harmful products; and 4) cannot demonstrate gross negligence necessary to establish punitive damages. MSJ at 13–25. Based on the record before the Court, none of these contentions succeeds in taking the case away from a jury.

**I. The Substantial Factor Test**

Kentucky negligence law analyzes causation according to the "substantial factor test" discussed above. *See, e.g.*, *Deutsch*, 597 S.W.2d at 144–45 (Ky. 1980). The Sixth Circuit has recognized that "the asbestos defendant, like every tort defendant, remains entitled to have a causative link proven between the defendant's specific tortious acts and the plaintiff's injuries." *Moeller*, 660 F.3d at 954 (quoting *Cardinal Indus. Insulation Co. v. Norris*, 2009 Ky. App. Unpub. LEXIS 1092 at *27 (Ky. App. 2009)). To establish causation, a plaintiff must prove two things: "(1) he was exposed to the defendant's product, and (2) the product was a substantial factor in causing the injury he suffered." *Lindstrom*, 424 F.3d at 492.

   A. **Exposure to Brake Supply Products**

Brake Supply first contends Mr. Papineau lacks evidence he was even exposed to any of its asbestos-containing brakes (as opposed to brakes from other suppliers), regardless of whether that exposure amounted to a substantial factor causing his mesothelioma. But the Papineaus point to significant record evidence in support of their claim that Mr. Papineau was exposed to asbestos from Brake Supply's products. MSJ Response at 14–15.

- The only type of brakes Mr. Papineau recalled using on brake jobs at Smith Coal were brakes supplied by Brake Supply. Papineau Dep. at 96:17–97:23.
- A Smith Coal employee testified that Brake Supply refurbished most of the kind of brakes Mr. Papineau would use. Rice Dep. at 50:13–18.
- Another Smith Coal employee testified that a majority of the company's brake products came from Brake Supply. Snow Dep. at 78:24–79:22.
- Mr. Papineau's supervisor recalled using rebuilt brakes from Brake Supply, which he identified as Smith Coal's primary supplier. Vandiver Affidavit (DN 355-8) at ¶ 7.
- Several Brake Supply employees testified that Brake Supply sold brakes to Smith Coal. *See, e.g.,* Ferguson Dep. at 85:3–12; Botsch Dep. (DN 355-12) at 54:8–20; Titus Dep. at 81:22–82:25.
- Brake Supply admits that it rebuilt and sold brakes with asbestos-containing friction products during a portion of Mr. Papineau's employment with Smith Coal. Berkley Dep. at 117:14–23; 136:21–25; 139:7–12.

Because Brake Supply points to conflicting evidence, a jury would not be compelled *to* credit this evidence, but it certainly *could*. Which means this Court may not take the question away from the jury by granting Brake Supply summary judgment on this basis. A reasonable jury could conclude that Mr. Papineau was exposed to asbestos from Brake Supply's brakes.

   B. **Substantial Exposure**

Relying on Sixth Circuit precedent rejecting the each-and-every exposure theory, Brake Supply also asserts that its products must've been a *probable* cause of the mesothelioma, not merely a *possible* one, for the Papineaus to recover. *See Moeller*, 660 F.3d at 953–54. But

14

construing the Papineaus' evidence in its most favorable light, a jury could conclude they have met this burden.

An "actor's negligent conduct is a legal cause of harm to another if … his conduct is a substantial factor in bringing about the harm." *Deutsch*, 597 S.W.2d at 143–44 (quoting Restatement (Second) of Torts § 431 (1965)). Comment (a) to § 431 of the Restatement (Second) of Torts explains that "[t]he word 'substantial' is used to denote the fact that the defendant's conduct has such an effect in producing the harm as to lead reasonable men to regard it as a cause, using that word in the popular sense, in which there always lurks the idea of responsibility[.]" *See also Cardinal Indus. Insulation Co.*, 2009 WL 562614, at *5 (applying the comment's definition of "substantial"). Interpreting this standard, the Sixth Circuit has held that "where a plaintiff relies on proof of exposure to establish that a product was a substantial factor in causing injury, the plaintiff must show a high enough level of exposure that an inference that the asbestos was a substantial factor in the injury is more than conjectural." *Lindstrom*, 424 F.3d at 492 (internal quotations and citation omitted).

Brake Supply argues that even assuming Mr. Papineau used its brakes (as discussed above), no evidence indicates the nature, length, frequency, or intensity of his exposures. MSJ at 16.

But in addition to the evidence discussed above, the Papineaus offer testimony regarding the "substantiality" of Mr. Papineau's exposure from an industrial hygienist and two medical doctors, Dr. Frank and Dr. Staggs. The industrial hygienist will testify about Mr. Papineau's likely exposure levels and how, in his view, those exposures exceeded safe background amounts. Relying on the hygienist's conclusions and other evidence of exposure, Dr. Staggs and Dr. Frank propose to opine that exposure to Brake Supply's asbestos-containing brakes was a substantial factor in causing Mr. Papineau's disease. MSJ Response at 10. Dr. Frank concluded that if even 25 percent of the brake jobs Mr. Papineau performed at Smith Coal were with asbestos-containing brakes from Brake Supply, those products would be a substantial contributing factor to his mesothelioma. Frank Dep. 162:7–163:17. This suffices to create a jury question under *Lindstrom*'s substantial factor test.

Despite Brake Supply's objections, the Papineaus' experts profess not to depend on the "each and every" theory; indeed, plaintiffs' counsel disavowed it at oral argument in favor of a "cumulative dose" theory. Oral Arg. Tr. at 17:23–18:13. In their words, this theory says that "lots of exposures contribute to the cumulative dose, but not all exposures are significant contributions to the cumulative dose." *Id.* at 18:17–19. Dr. Frank and Dr. Staggs both testify that Mr. Papineau's exposure to products from Brake Supply were "significant contributions to the cumulative dose." *Id.*

Is this just indistinguishable repackaging of the each-and-every theory the Sixth Circuit has already held insufficient? *See, e.g., Martin,* 561 F.3d at 443; *Stallings*, 675 Fed. App'x at 551 (considering, *e.g.*, testimony from Frank). As discussed above, although Dr. Frank's testimony in other cases did not distinguish between significant competing sources of asbestos exposure, or discuss the relative significance of each source, the Papineaus' presentation is framed differently. Although caselaw makes clear that evidence merely that "every little bit helps" (or hurts) may not satisfy Kentucky's causality standard, those decisions did not confront, much less rule out, the

"cumulative dose" theory described here. The Papineaus' experts propose to say that Mr. Papineau's exposure to Brake Supply's products was a substantial contributing factor. Regardless of whether the Papineaus can convince a jury that Mr. Papineau's exposure to Brake Supply products was a substantial factor in causing his mesothelioma, they will at least have the chance to present their side.

## II. Middleman or Manufacturer

The Kentucky Middleman Statute, KRS 411.340, "protect[s] those who merely sell … products" from liability for harm caused by those products. *Parker v. Henry A. Petter Supply Co.*, 165 S.W.3d 474, 477 (Ky. Ct. App. 2005). Defendants relying on the statute must satisfy two conditions. First, "the manufacturer must be identified and subject to the Court's jurisdiction." *Salisbury v. Purdue Pharma, L.P.*, 166 F. Supp. 2d 546, 551 (E.D. Ky. 2001). Second, "the product sold by the wholesaler, distributor or retailer mu*st have been unaltered from its original manufactured condition*." *Id.* (emphasis added). If these two threshold determinations are met, the statute shields "the wholesaler, distributor or retailer" from liability unless a plaintiff demonstrates it "breached an express warranty, or … knew or should have known at the time of distribution or sale that the product was in a defective condition and unreasonably dangerous." *Id.*

Critical here, the Middleman Statute only applies to a product sold "in its original manufactured condition or package, or in the same condition such product was in when received by said wholesaler, distributor or retailer." KRS 411.340.

Kentucky courts have construed the statute narrowly. *West v. KKI, LLC* held that assembling an amusement park ride is an alteration—even though the assembly followed the manufacturer's instructions—because the alleged middleman had independent responsibility for assembly. 300 S.W.3d 184, 192 (Ky. App. 2008). Another court ruled that cutting several feet off a truck chassis before sending it to the end-user is an alteration. *Worldwide Equip. v. Mullins*, 11 S.W.3d 50, 60 (Ky. App. 1999). And another explained that a reasonable jury could find that removing a warning label from oysters before serving them to restaurant patrons was an alteration. *Edwards v. Hop Sin, Inc.*, 140 S.W.3d 13, 17 (Ky. App. 2003).

The record at this stage supports the conclusion that Brake Supply acted similarly. It relined used brake shoes with new friction linings before selling them. Berkley Dep. at 118:1–6. By so doing, even if according to manufacturer instructions or by making minor alterations that did not affect the make-up of the materials used (facts not established in the record at this juncture), Brake Supply altered the products under Kentucky law, rendering the statute's protections inapplicable. *See KKI*, 300 S.W.3d at 192 (The Middleman Statute protects "only those distributors, wholesalers, or retailers, who have no independent responsibility for the design or manufacture of a product"). Additionally, Brake Supply removed friction liners from original packaging and distributed them in Brake Supply packaging, removing any warnings that came on the original packaging. *Id.* at 145:2–22. The Court therefore denies summary judgment on this basis. Should evidence at trial support a different conclusion, Brake Supply may renew its defense at that time. *See* Oral Arg. Tr. at 76:20–23.

**III.     Gross Negligence and Punitive Damages**

The Complaint asserts a claim for punitive damages. Complaint (DN 1) at ¶ 43. To recover punitives, a plaintiff must prove (among other things) "that something about the defendant's conduct was outrageous, was at least grossly negligent, and amounted to reckless indifference." *Sufix, U.S.A., Inc. v. Cook*, 128 S.W.3d 838, 841 (Ky. Ct. App. 2004); *M.T. v. Saum*, 3 F. Supp. 3d 617, 624 (W.D. Ky. 2014) ("In Kentucky, the well established common law standard for awarding punitive damages [is] gross negligence.") (internal quotation marks and citation omitted).[2] "The essential question at the heart of the gross negligence analysis is whether the misconduct has the character of outrage." *Saum*, 3 F. Supp. 3d at 625 (internal quotation marks and citation omitted).

The Kentucky Supreme Court has upheld an award of punitive damages supported by evidence that the defendant acted with "flagrant indifference" or "engaged in misrepresentation, deceit or concealment of a known fact with the intention of causing injury" to the plaintiff. *Owens-Corning Fiberglas Corp. v. Golightly*, 976 S.W.2d 409, 412–13 (Ky. 1998). The Kentucky Supreme Court agreed that "substantial evidence" indicated the defendant knew "that exposure to asbestos could cause" serious illness, "continued to manufacture, sell and/or distribute" those products "without affixing any warning labels," and "intentionally concealed, minimized, and even misrepresented the health effects of working with the product." *Id.* at 411. But when the record lacks evidence that the alleged tortfeasor acted with "oppression or malice," courts have excluded claims for punitive damages at the summary-judgment stage. *See Gooch v. E.I. DuPont de Nemours & Co.*, 40 F. Supp. 2d 857, 863 (W.D. Ky. 1998).

The record indicates that Brake Supply knew about the hazards of asbestos by the late 1970s and began actively seeking alternatives to its friction products. Botsch Dep. at 137:7–12. As soon as those alternatives became available and viable, Brake Supply says it switched to those materials. *Id.* at 137:13–16. But safety concerns with the early alternatives apparently delayed Brake Supply from fully switching to those products until sometime in 1986. *Id.* at 41:13–18, 138:5–11. For its employees, Brake Supply insists it implemented several safety protocols and used a "dust collection system" in its friction shop where it used asbestos-containing products. Ferguson Dep. at 27:12–16.

The Papineaus contend that Brake Supply "never provided asbestos warnings to its customers with its rebuilt brakes." MSJ Response at 9 (emphasis omitted). The record is more nuanced. When Brake Supply removed brakes from the manufacturer's packaging, evidence shows it neither forwarded the original warning (if any) nor affixed its own warning to the products. Berkley Dep. at 145:2–12. But Brake Supply made available the Material Safety Data Sheets it received from the manufacturers when its customers requested them, which included asbestos information. *Id.* at 145:15–21. And Brake Supply sometimes sold friction products still in the packaging supplied by the manufacturer, which included any manufacturer warnings. *Id.* at 143:22–144:8.

---

[2] KRS 411.184(2), cited by the Papineaus, states: "A plaintiff shall recover punitive damages only upon proving, by clear and convincing evidence, that the defendant from whom such damages are sought acted toward the plaintiff with oppression, fraud or malice."

17

The Papineaus have not pointed to the evidence of gross negligence they would have to present in order to recover punitive damages. Based on this record, a jury might second-guess the way Brake Supply handled its products or navigated the industry's transition away from asbestos. But nothing identified in the summary-judgment record would support a finding that Brake Supply "intentionally concealed, minimized, and even misrepresented" the potential effects of its friction products. *Golightly*, 976 S.W.2d at 411. Absent other evidence of a plan or pattern of deception, that the company removed some warnings during its transition to less hazardous materials does not reveal the level of "outrageous" conduct courts have perceived when allowing punitive-damages claims to proceed. *See Miller's Bottled Gas, Inc. v. Borg-Warner Corp.*, 56 F.3d 726, 734 (6th Cir. 1995).[3] The Court therefore grants Brake Supply's motion for summary judgment on the Papineaus' punitive-damages claim, but could revisit this issue should evidence at trial paint an uglier picture.

## CONCLUSION

The Court denies in part and grants in part Brake Supply's motion for summary judgment (DN 337), denies in part and grants in part the motion to exclude the testimony of Steven Paskal (DN 346), and denies the remaining motions in limine (DNs 341, 342, 343, 344, 345, 347, 348, 353).

Benjamin Beaton, District Judge
United States District Court

September 30, 2021

---

[3] *Contra, e.g.*, *Cantrell v. GAF Corp.*, 999 F.2d 1007, 1015 (6th Cir. 1993) (evidence indicated Defendant knew "injuries were substantially certain to occur" and "asbestos exposure had caused cases of death and hundreds of cases of restrictive lung disease" but maintained a "policy … to withhold company knowledge concerning disease," and "did nothing in response to the information … 'except keep quiet and hope this thing wouldn't blow up in their face at some point.'"); *City of Dayton v. A.R. Env't, Inc.*, No. 3:11-cv-383, 2012 WL 5342496, at *5 (S.D. Ohio Oct. 29, 2012) ("[U]ndisputed evidence demonstrates A.R. consciously disregarded the safety of the public when it failed to remove [asbestos-containing material] before demolishing a building, and also illegally buried [asbestos-containing material] on more than 40 properties in the City.").