## UNITED STATES DISTRICT COURT
## WESTERN DISTRICT OF KENTUCKY
## OWENSBORO DIVISION

**HOLLY PAPINEAU, INDIVIDUALLY AND AS EXECUTRIX OF THE ESTATE OF JACK PAPINEAU**       **PLAINTIFFS**

v.                                                                                     No. 4:18-cv-168

**BRAKE SUPPLY COMPANY, INC., ET AL.**       **DEFENDANTS**

---

**BRAKE SUPPLY COMPANY, INC.**       **THIRD-PARTY PLAINTIFF**

v.

**FRAS-LE S.A., ET AL.**       **THIRD-PARTY DEFENDANTS**

\* \* \* \* \*

### OPINION AND ORDER

After doctors diagnosed Jack Papineau with mesothelioma, he and his wife sued Brake Supply and several manufacturers of products that allegedly contained asbestos. In turn, Brake Supply sought indemnification or apportionment from Fras-Le South America and its American subsidiary, alleging that they sold Brake Supply asbestos-containing brakes. Amended Third Party Complaint (TPC) (DN 154) ¶¶ 18–21, 27, 30. Brake Supply asserts it sold some of these brakes into Kentucky, which Papineau's employer may have purchased and Papineau may have worked with. ¶¶ 10, 18–21. Fras-Le moved to dismiss for a lack of personal jurisdiction under Kentucky's long-arm statute and the U.S. Constitution. DN 383.

Brake Supply's attempt to hale Fras-Le before this Court rests on a tenuous connection to the Commonwealth. If some of Fras-Le's brakes ended up in Kentucky, generating substantial but indirect revenue for Fras-Le, does that amount to minimum contacts within the state? The answer is no, because those sales depended on the unilateral actions of two intermediary companies. Such attenuated links are insufficient to establish personal jurisdiction under Kentucky law or the federal Due Process Clause.

### I. The Record

One of the manufacturers Brake Supply sued for indemnity is the Brazilian company Fras-Le South America, along with its American subsidiary Fras-Le North America. According to Fras-Le's marketing and export manager, Felipe De Carvalho,

1

Fras-Le manufactures brake pads and clutch assemblies in Brazil. Carvalho Declaration (DN 383-3) ¶¶ 6–8.[1] Initially Carvalho believed that the company sold only to other manufacturers. *Id.* ¶ 11. But during this litigation he discovered records from the mid-eighties and early nineties that show Fras-Le also sold to a distributor called Prudential Supply Corporation. Carvalho Deposition (DN 383-7) at 37–41. Prudential is apparently based in New York and would ensure shipment of Fras-Le products from Brazil to Prudential's North American customers. Kim Kixmiller Deposition (DN 393-4) at 34; Ken Botsch Deposition (DN 388-6) at 133–34. Some evidence indicates Fras-Le made between $1.27 million and $2.2 million in annual sales to Prudential from 1986 to 1990. Carvalho Depo. at 83–90; Carvalho Sealed Testimony (DN 389) at 86–89; *see generally* Fras-Le Export Sales Records (DN 390). And one of Prudential's customers was Brake Supply. Botsch Depo. at 80, 133–34.

Brake Supply is a seller of brake parts based in Evansville, Indiana. TPC ¶¶ 3, 18. The Papineaus sued Brake Supply for selling asbestos-containing brakes to his employer, Smith Coal. Complaint (DN 1) ¶¶ 12, 23. Jack Papineau allegedly worked on these brakes for Smith in western Kentucky from 1984 to 1992. *Id.* ¶ 12. So Brake Supply sought indemnity from its suppliers, including Fras-Le. TPC ¶¶ 18–21, 27. Several Brake Supply employees from the period recalled seeing Fras-Le products in the company's Evansville warehouse. Botsch Depo. at 77, 80, 133–34; Kixmiller Depo. at 34, 126–27; Tim Titus Deposition (DN 383-11) at 29–30. Brake Supply represents that it resold Fras-Le products into Kentucky for the type of equipment Papineau worked on. TPC ¶¶ 18–20; Titus Depo. (DN 388-7) at 39, 69. But it does not or cannot say with certainty whether it sold such products to Smith Coal, or whether Papineau used those products. Tom Berkley Deposition (DN 383-12) at 36; Kixmiller Depo. at 8, 46, 76–80; Botsch Depo. (DN 383-8) at 61–62; Titus Depo. (DN 388-7) at 118.[2]

Fras-Le conducted an investigation into its sales during this period, including whether it had any contacts with Kentucky. Carvalho Decl. ¶ 14; Carvalho Depo. 43–44. According to Carvalho, Fras-Le found no evidence that it ever targeted, marketed, contracted, directly supplied goods, shipped, designed, tested, manufactured,

---

[1] Fras-Le North America moved for summary judgment, arguing that it cannot indemnify conduct that occurred before it existed. DN 302. Undisputed evidence showed that the North America subsidiary was not purchased by Fras-Le until 1995, so it could not be held liable for conduct occurring between 1984 and 1992. DN 356 at 7–10. The Court granted summary judgment on that ground, but ruled that Brake Supply could seek apportionment based on the evidence at trial. *Id.*

[2] Fras-Le argues that all of the evidence shows Brake Supply stopped buying Fras-Le products before the relevant period. Fras-Le Reply (DN 393) at 2–5. Fras-Le also says it stopped selling asbestos brakes for much of the period. *Id.* The court need not decide this issue because any such sales, even assuming they existed, were too attenuated from Kentucky.

2

purchased material from, derived revenue from, solicited or owned a business, owned property, or had an agent in Kentucky. Carvalho Decl. ¶¶ 11, 13, 15, 19–31, 35–49; Carvalho Depo. 31, 43–44, 47, 50, 80–82. Fras-Le also provided evidence that it lacked control over its products after they were initially sold. Carvalho Decl. ¶¶ 13–15. And Fras-Le never had contact with Papineau nor his employer Smith Coal. *Id.*

Due to these limited contacts, Fras-Le moved to dismiss the third-party claims for a lack of personal jurisdiction. DN 383. For Brake Supply's part, it argues that Fras-Le sold products widely into Kentucky, earned substantial revenue from those sales, maintained contacts to Kentucky through Prudential and Brake Supply, and thereby subjected itself to personal jurisdiction in Kentucky. MTD Response (DN 388) at 6–12. This is incorrect.

## II. This Court's Jurisdiction over Fras-Le

In order for a federal court to assert personal jurisdiction over a defendant, the requirements of the "forum state's long-arm statute and the due process requirements of the Constitution must be met." *CompuServe, Inc. v. Patterson*, 89 F.3d 1257, 1262 (6th Cir. 1996) (quotation omitted). The plaintiff "bears the burden of establishing the existence of personal jurisdiction." *AlixPartners, LLP v. Brewington*, 836 F.3d 543, 548 (6th Cir. 2016). A federal court "may determine the motion on the basis of affidavits alone; or it may permit discovery in aid of the motion; or it may conduct an evidentiary hearing on the merits of the motion." *Serras v. First Tenn. Ban Ass'n*, 875 F.2d 1212, 1214 (6th Cir. 1989) (quotation omitted). Even if a court relies on the written submissions, "the plaintiff may not rest on his pleadings to answer the movant's affidavits, but must set forth, by affidavit or otherwise, ... specific facts" that, viewed in the light most favorable to the plaintiff, make out a prima facie case of jurisdiction. *Id.* (quotation omitted). This is not a high bar. But neither is it one Brake Supply can clear.

### A. Kentucky's Long-Arm Statute

Unlike most states, "Kentucky's long-arm statute is narrower in scope than the federal due process clause," so the Court will consider it first. *Cox v. Koninklijke Philips, N.V.*, 647 F. App'x 625, 628 (6th Cir. 2016) (citing *Caesars Riverboat Casino, LLC v. Beach*, 336 S.W.3d 51, 55–57 (Ky. 2011)). The statute permits a court to "exercise personal jurisdiction over a person who acts directly ... as to a claim arising from" several enumerated activities. KRS § 454.210(2)(a)(1)–(9). Brake Supply relies only on a portion of subsection 4: it asserts that Fras-Le "regularly does or solicits business, or engages in any other persistent course of conduct, or derives substantial revenue from goods used or consumed or services rendered in this Commonwealth." *Id.* at (2)(a)(4); Response to MTD (DN 388) at 6–7, 9. Brake Supply's basic argument is that Fras-Le "sold *potentially* millions of dollars of product to Brake Supply *through Prudential over multiple decades*, a portion of which was during the Applicable Period," and that Prudential "directly shipped that product to Brake Supply in

3

*Evansville.*" Response at 5 (emphas added). Once in Indiana, according to Brake Supply, the products "were resold to Brake Supply's customers, including commercial customers in the Illinois Basin[,] which encompassed western Kentucky coal territory" and could therefore include Papineau's employer Smith Coal. *Id.*

Notice that Brake Supply doesn't contend that Fras-Le ever directly did anything in Kentucky—even though the word "directly" is right there in the Kentucky long-arm statute. KRS § 454.210(2)(a). The connections between Fras-Le and Kentucky, moreover, are far too attenuated to conclude that Fras-Le engaged in a "persistent course of conduct, or derived substantial revenue from" Kentucky. *Id.* § 454.210(2)(a)(4). After all, at least two independent intermediaries separate Fras-Le and Kentucky. Everyone agrees that Fras-Le sold brakes to Prudential, a New York distributor, which would then sell and ship the brakes from Brazil. Carvalho Depo. at 37–41; Kixmiller Depo. at 32, 34; Botsch Depo. (DN 388-6) at 133–34. Fras-Le received its revenue from those initial sales to Prudential. Carvalho Decl. ¶¶ 13–15. After that point, Fras-Le did not share in the revenue from any subsequent transactions by Prudential or anyone else. *Id.* Prudential would sell some of those brakes to Brake Supply, shipping the brakes directly from Brazil to Evansville, Indiana. Botsch Depo. (DN 388-6) at 77, 80, 133–34; Kixmiller Depo. at 34, 126–27.

Only after Brake Supply received the product in Indiana did it sell some over the Ohio River and into Kentucky. Titus Depo. (DN 388-7) at 39, 69. Brake Supply tries to blur this boundary, pointing out that the company's location is "just a few miles from the Kentucky-Indiana border." Response at 4. But state borders matter in law—especially the law of personal jurisdiction! The text of Kentucky's long-arm statute contains no across-the-river exception, and it's hardly obvious that companies situated near state lines would really want to be treated as at home on both sides of the boundary.

This case is nearly identical to *Holbrook v. Mazda Motor Corp.*, No. 6:17-cv-244, 2018 WL 1571905, at *3 (E.D. Ky. Mar. 30, 2018). There the court found no evidence of "persistent conduct" or "substantial revenue" under the Kentucky long-arm statute based on a Japanese manufacturer's car parts reaching Kentucky after an intermediary resold a substantial amount of those parts to another out-of-state company, which then sold into Kentucky. *Id.* The court relied on a declaration that the company never contracted, sold, marketed, or received any revenue in Kentucky. *Id.* So too here: Fras-Le's declaration states that the company never directly produced, sold, shipped, marketed, contacted, received revenue, or otherwise engaged with anyone in Kentucky. Carvalho Decl. ¶¶ 11, 13, 15, 19–31, 35–49; Carvalho Depo. 80–82, 43–44, 31, 47, 50. Moreover, the declaration says Fras-Le never directed Prudential or Brake Supply to resell these brakes anywhere in particular—much less into Kentucky specifically—or that Fras Le got any portion of the revenue from those resales. Carvalho Decl. ¶¶ 12–15.

To argue that jurisdiction must exist based on Fras-Le's commercial connections with Kentucky, Brake Supply points to *Finance Ventures v. King*, 131 F. Supp. 3d 677, 685 (W.D. Ky. 2015). There the court ruled that the defendant directed "a persistent course of conduct" at Kentucky because he created an interactive website that sought out individuals in Kentucky to seek arbitration in Kentucky for a refund from a Kentucky company. *Id*. On Brake Supply's reading, what mattered was the harm to the plaintiff in Kentucky, given that the site was made outside of Kentucky and most viewers were not from Kentucky. This is incorrect. The reasoning in *Finance Ventures* concerned whether the defendant caused a tortious injury within Kentucky. *Id*. The "more difficult question," according to the court, was whether the defendant met the prerequisites of KRS § 454.210(2)(a)(4): "regularly doing or soliciting business, or engaging in a persistent course of conduct." *Id.* The creation of a website to recruit others to join his arbitration against the plaintiff was insufficient. *Id*. Instead, the analysis turned on the defendant's conduct directed specifically at Kentucky: the defendant engaged with some commentors and directed viewers to "contact the Owensboro office of the FBI and Kentucky's Attorney General." *Id*. So the defendant was directly and consistently soliciting Kentucky residents to take actions in Kentucky. That's a far cry from this case, in which no evidence indicates Fras-Le contacted anyone in Kentucky for any purpose.[3] Carvalho Decl. ¶¶ 11, 13, 15, 19–31, 35–49. Fras-Le merely sold brakes to an intermediary, which sold some of those brakes to Brake Supply, which then resold some of those brakes into Kentucky—all without Fras-Le's direction. *Id*. ¶¶ 12–15.

Only Brake Supply's unilateral sale at the end of this chain involves Kentucky at all. The independent Kentucky sales by one company, two steps removed from the defendant, is not enough to subject that defendant to personal jurisdiction in Kentucky. *See Holbrook*, 2018 WL 1571905, at *3. To hold otherwise would massively expand the long-arm statute to include anyone involved in a product's life cycle from the manufacturer to the consumer.

### B. Due Process

---

[3] Brake Supply also highlights *Eat More Wings, LLC v. Home Market Foods, Inc.*, 282 F. Supp. 3d 965, 967–68 (E.D. Ky. 2017), to argue the revenue here was substantial. But that case involved different parts of the statute and turned on the fact that Kroger asked for samples from and negotiated contracts with a Kentucky-based plaintiff regarding its product. *Id*. at 970. The court concluded Kroger caused tortious injuries in Kentucky by selling thousands of similar products into the state and generating $200,000 in revenue. *Id*. Brake Supply infers, without any evidence, that Fras-Le likely received just as much revenue from Kentucky. But the issue here is the attenuation between Fras-Le and Kentucky, not the amount of revenue that flowed through the links in the stream of commerce between Kentucky and Fras-Le. So *Eat More Wings* is not particularly relevant. And unlike Fras-Le, Kroger directly made contacts and sold products in Kentucky.

Even if the long-arm statute allowed this Court to exercise jurisdiction over Fras-Le under Kentucky law, the federal Constitution would bar it. Due process requires "minimum contacts … with the forum State … such that [a defendant] should reasonably anticipate being haled into court there." *World-Wide Volkswagen Corp. v. Woodson*, 444 U.S. 286, 291, 297 (1980). The Due Process Clause allows for two types of personal jurisdiction: general and specific. *Goodyear Dunlop Tires Operations, S.A. v. Brown*, 564 U.S. 915, 919 (2011). Brake Supply argues only for specific jurisdiction. This requires a court to find "(1) purposeful availment of the privilege of acting in the forum state or causing a consequence in the forum state, (2) a cause of action … aris[ing] from activities in the state, and (3) a substantial enough connection with the forum state to make the exercise of jurisdiction over the defendant reasonable." *Schneider v. Hardesty*, 669 F.3d 693, 701 (6th Cir. 2012) (quotation omitted).

Purposeful availment ensures that defendants will not fall within the jurisdiction of a court because of "random, fortuitous, or attenuated contacts," or because of the "unilateral activity of another party or a third person." *Burger King Corp. v. Rudzewicz*, 471 U.S. 462, 475 (1985) (quotations omitted). Placing a "product into the stream of commerce, without more," is insufficient, even if it was foreseeable that the product would reach the forum state. *Bridgeport Music, Inc. v. Still N The Water Pub.*, 327 F.3d 472, 479 (6th Cir. 2003) (adopting and quoting the "stream of commerce plus theory" from *Asahi Metal Industry Company, Ltd. v. Superior Court*, 480 U.S. 102, 112 (1987) (O'Connor, J.) (plurality op.)); *see also J. McIntyre Mach., Ltd. v. Nicastro*, 564 U.S. 873, 882 (2011) (plurality op.) (foreseeability insufficient). On the other hand, the Supreme Court has recognized purposeful availment "where the contacts proximately result from actions by the defendant himself that create a 'substantial connection' with the forum State." *Burger King*, 471 U.S. at 475 (quotation omitted).

At best, the record indicates that two independent companies made unilateral decisions that resulted in some products being sold into Kentucky. This is insufficient to make out a prima facie case of purposeful availment. The Sixth Circuit has applied this test in a similar case and reached the same conclusion. The court of appeals held in *Bridgeport Music* that a music publisher did not purposefully avail itself of Tennessee's laws and protections because it was "merely aware" that its distributor was likely to target every state. 327 F.3d at 480–484. Another publisher, by contrast, *did* purposefully avail itself in the same state when it made the "deliberate decision" to ask the distributor to target each state. *Id.*; *see also Parker v. Winwood*, 938 F.3d 833, 840–41 (6th Cir. 2019) (no purposeful availment by musician based on *distributor's* targeting of forum state). So the unilateral actions of another party—even for the benefit of a defendant—may not create minimum contacts for the party that receives the benefit. Only when that party takes affirmative action by deliberately directing those contacts, through the actions of another, does it meet the purposeful-availment threshold.

6

Fras-Le manufactured its products in Brazil. Carvalho Decl. at ¶¶ 6–8. It sold some of those products to Prudential, a New York distributor, which resold and shipped a subset of the products to Brake Supply in Evansville, Indiana. Carvalho Depo. at 37–41; Kixmiller Depo. at 32, 34, 126–27; Botsch Depo. (DN 388-6) at 80, 133–34. Brake Supply then resold some of the product into Kentucky. Titus Depo. (DN 388-7) at 39, 69. At no point did Fras-Le produce, contract, market, distribute, engage with, derive revenue from, or sell directly to anyone in Kentucky. Carvalho Decl. ¶¶ 11, 13, 15, 19–31, 35–49; Carvalho Depo. 80–82, 43–44, 31, 47, 50. Nor does any evidence indicate that Fras-Le was even "aware" that its brakes were being sold into Kentucky, much less that it "deliberately" directed Prudential or Brake Supply to target Kentucky. *See Bridgeport*, 327 F.3d at 480–484; *Id*. ¶¶ 12–15. The "attenuated" chain Brake Supply uses to connect Fras-Le with Kentucky is premised on the "unilateral" actions of Prudential and itself. *Burger King*, 471 U.S. at 475. By definition, this is insufficient to show that Fras-Le purposefully availed itself of the benefits and protections of doing business in the Commonwealth.

Brake Supply resists this conclusion by pointing to the Supreme Court's ruling in *Ford Motor Co. v. Montana Eighth Judicial District Court*, --- U.S. ---, 141 S. Ct. 1017 (2021). Nothing in that decision bears on this case. *Ford* involved car accidents involving Ford vehicles in Montana and Minnesota. *Id*. at 1023. But the cars were designed, assembled, and initially sold elsewhere, only ending up in the relevant states after resales. *Id*. Ford conceded that it had purposefully availed itself of the laws and benefits of Montana and Minnesota by consistently selling and advertising the allegedly defective products in those states. *Id*. at 1026, 1028. According to Ford, however, "the needed link must be causal in nature," such that "[j]urisdiction attaches only if the defendant's forum conduct *gave rise* to the plaintiff's claims." *Id*. at 1026 (internal quotation omitted). The Supreme Court disagreed, holding that personal jurisdiction does not require a "strict causal relationship between the defendant's in state activity and the litigation." *Id*. at 1026. Instead, a case can "relate to the defendant's contacts" without the causal connection Ford emphasized. *Id*. And Ford's pervasive contacts with the states related to the litigation because Ford advertised and serviced the vehicles in those states, so Ford couldn't escape jurisdiction based on the location of the plaintiffs' purchases. *Id*. at 1029. Unlike Ford, Fras-Le never marketed, serviced, or sold its products directly into Kentucky.[4] Fras-Le has not conceded its contacts with Kentucky, given that its only connection comes from the

---

[4] Fras-Le also argues that the litigation didn't arise out of any contacts in Kentucky, the core issue in *Ford*. Because Brake Supply cannot show that Fras-Le purposefully availed itself of Kentucky, however, the Court does not reach this argument. Similarly, Fras-Le contends that haling a foreign company into court over conduct decades ago for an indemnity claim would violate "traditional notions of fair play and substantial justice," analogous to the reasoning set forth in *Asahi*, 480 U.S. at 113–114. Again, the Court needn't reach this argument.

7

unilateral actions of two intermediaries. If anything, the significant contacts present in *Ford* offer a useful contrast to the dearth of contacts present in this case.

Brake Supply's entire argument rests on the independent actions of Prudential and itself. No evidence shows Fras-Le ever had contacts in Kentucky besides Brake Supply's unilateral sales into the Commonwealth. This is insufficient to show that Fras-Le purposefully availed itself for purposes of due process and specific personal jurisdiction.

## III. Conclusion

So the Court grants Fras-Le's Motion to Dismiss for a Lack of Personal Jurisdiction (DN 383).[5]

Benjamin Beaton, District Judge
United States District Court

May 6, 2022

---

[5] Brake Supply also seeks to apportion fault to Fras-Le if evidence at trial will allow it. Kentucky law allows for apportionment even against a "tortfeasor who is not actually a defendant … if he was named as a defendant in the plaintiff's complaint even though the complaint was subsequently dismissed as to him." *Floyd v. Carlisle Constr. Co.*, 758 S.W.2d 430, 432 (Ky. 1988); KRS § 411.182. In an earlier decision, this Court allowed Brake Supply to maintain its apportionment claim against Fras-Le North America notwithstanding its grant of summary judgment in Fras-Le North America's favor. DN 356 at 7–10. Fras-Le SA never responded to Brake Supply's argument for an apportionment instruction at trial here. So one might think the result should be the same. But Fras-Le North America won summary judgment on the merits, not on jurisdiction.

Based on the parties' briefing, it is hardly clear how the Court may or should apportion fault against a party over which it lacks jurisdiction. Indeed, the Kentucky Court of Appeals has said that KRS § 411.182 does not authorize "a court to exercise jurisdiction over persons who could not otherwise be summoned in that jurisdiction." *Copass v. Monroe Cty. Med. Found., Inc.*, 900 S.W.2d 617, 619 (Ky. Ct. App. 1995). The Due Process Clause obviously prevents KRS § 411.182 from extending a federal court's authority over a party for purposes of imposing liability without minimum contacts with the forum state. Whether apportionment can feature merely as a defense or as a question for the jury, however, is less clear. Given the lack of briefing on this issue, the parties (including Fras-Le North America) may promptly file additional motions or briefs on this issue so the Court may address Brake Supply's request at a later point.